UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SENATE MANOR PROPERTIES, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-0799-LJM-TAB |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN DEVELOPMENT, | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF & ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On September 26, 2008, this Court consolidated plaintiff's, Senate Manor

Properties, LLC ("Senate Manor"), Motion to Preliminary Injunction and its request in its

Amended Complaint for declaratory and injunctive relief under the Administrative

Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*  On October 10, 2008, defendant, United

States Department of Housing & Urban Development ("HUD"), filed a Motion for Summary

Judgment on the Merits of Plaintiff's APA Claims.  On October 15, 2008, the Court held a

hearing on the allegations in Senate Manor's Amended Complaint and on HUD's Motion

for Summary Judgment.  Essentially, Senate Manor contends that HUD violated the APA

when it failed to follow its own procedures to abate Section 8 payments to Senate Manor

pursuant to a Housing Assistance Payment ("HAP") Contract that Senate Manor entered

into with the Indiana Housing and Community Development Authority ("IHCDA").  HUD

contends that it had the authority to abate payments to Senate Manor under the facts

presented to HUD decision makers.

The Court finds as follows.

# I. STANDARD OF REVIEW

Under the APA the Court must set aside an agency decision "if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971), *abrogated on unrelated grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (quoting 5 U.S.C. §§ 706(2)(A), (B), (C), (D) (1964 ed., Supp. V)). *See also Cowherd v. U.S. Dep't of Housing & Urban Dev.*, 827 F.2d 40, 42 (7th Cir. 1987). The Court starts with an inquiry into whether HUD acted within the scope of its authority and discretion. *See Overton Park*, 401 U.S. at 415-16. The Court must consider Congress' grant of authority to HUD and whether HUD properly construed its authority to abate Senate Manor's subsidies. *See id.* at 416. The Court must be able to find that HUD "could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." *Id.*

The Court must also find that HUD's "choice was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). "[T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The [C]ourt is not empowered to substitute its own judgment for that of [HUD]." *Id.*

Finally, the Court must determine whether HUD's action followed the necessary procedural requirements. *Id.* at 417.

In making these determinations, the Court must review "the full administrative record that was before [HUD] at the time [it] made [its] decision." *Id.* at 420.

## II. THE ADMINISTRATIVE RECORD

The facts as set forth in the administrative record are these:

In August 2000, IHCDA's[1] predecessor, Indiana Housing Finance Authority, entered into an Annual Contributions Contract ("ACC") with HUD, in which IHCDA agreed to act as a Public Housing Agency ("PHA").  AR 574-95.  Under the ACC, IHCDA provides contract administrator services for units receiving project-based Section 8 housing assistance.  AR 578-79.  Through the ACC, HUD sought "to achieve three programmatic and three administrative objectives."  AR 598.  The programmatic objectives include to "[e]nforce owner obligations to provide decent housing for eligible families."  *Id.*

The ACC requires IHCDA to perform all of its responsibilities thereunder "in accordance with applicable provisions of . . . [t]he United States Housing Act of 1937 (42 U.S.C. [§] 1437 *et seq.*) and other Federal laws."  AR 581.  In addition, the ACC demands that IHCDA "require owners to comply with HUD requirements for occupancy of covered units, including requirements governing eligibility for assistance, resident contribution to rent, and examinations and reexaminations of family income."  AR 582.  Moreover,

> [IHCDA] shall take prompt and vigorous action, to HUD's satisfaction, and as required or directed by HUD, to enforce owner compliance with the terms of HAP contracts for covered units.  Such actions include requiring actions by the owner to cure a default, termination, or abatement or other reduction of housing assistance payments, termination of the HAP contract, or recovery

---

[1]IHCDA is an entity of the State of Indiana.  Ind. Code § 5-20-1-3.

> of overpayments.  However, [IHCDA] may not terminate a HAP contract without HUD's prior written consent.

*Id.*  The ACC makes IHCDA responsible for determining the amount of payments to owners in accordance with the terms of a HAP contract, and responsible for payment to owners under a HAP contract from an amount paid to it by HUD.  *Id.*

> With respect to actual inspections of Section 8 properties, under the ACC:

> HUD has or will conduct a baseline physical inspection for every Section 8 property with a HUD-administered HAP contract.  The Real Estate Assessment Center's ("REAC") physical inspection software and protocol is being used for all inspections. (See http://www.hud.gov/reac/reaphyin.html). Once this baseline physical inspection is completed, HUD will determine frequency of future inspections.  HUD may issue a task order under the ACC to have the PHA perform annual physical inspections.  If such a task order is issued, HUD will negotiate with the PHA a fixed-price fee for such services at that time.

> **Outcome:**   Verify completion of corrective actions based upon the analysis of the results of the annual physical inspection conducted on properties included in the ACC.  Take legal actions as directed by HUD for enforcement of the HAP contract.

**Requirements:**

**Post Inspection Activities:**

☐   Provide follow-up with owner on violations and corrective actions needed.

☐   Provide owner with time-frame to correct violations.

☐   Work with owner to eliminate the deficiencies.

☐   Abate payments when owner fails to correct violations within designated time period.

☐   Notify jurisdictional HUD office of abatement of payments and specific reasons for the action.

☐   Notify jurisdictional HUD office of the completion of required actions.

4

☐    Take legal action as directed by HUD for enforcement of the HAP contract.

AR 621-22.

The ACC also excludes third parties from suing under the provisions of the contract. AR 594.

In a memorandum dated April 7, 2003, HUD discussed the proper procedures for disposition and enforcement of HUD regulations at properties that obtained physical inspection scores below 60. AR 1-5. The memorandum states, in part:

> No longer will HUD allow properties to be assisted or insured when the tenants are not receiving quality housing. The Field Office must give special attention to any property whose physical condition fails to meet the standards as indicated by a physical inspection score of less than 60 points. The owner will be offered an opportunity to achieve a physical inspection score over 60. Upon re-inspection after 60 days, if the property again fails to achieve a score above 60, the **Field Office must take decisive action.**
>
> If the result of the second inspection indicates continued physical condition problems (e.g., a score less than 60) the Hub must take action immediately and develop a Compliance/Disposition/Enforcement Plan. In contemplating one or more of the options . . . the Hub Director will ensure that the conditions existing at the property are significant.

AR 1 (emphasis in original). The memorandum describes two forms of such "significance." *Id.* Once a Hub Director decides that the conditions at the property are significant enough to warrant action, one of the options available is abatement and termination of the Section 8 contract. AR 2. If the Hub Director makes this choice, he "must make a determination that the market can accommodate voucher holders, and order and issue them for the affected tenants." *Id.*

In April 2004, Senate Manor took possession of an existing Section 8 housing property, and was assigned that property's project-based HAP contract. AR 338, 340, 414.

5

The Section 8 Project Number assigned to the seventy-seven unit residence was IN36-E000-018.  AR 340.  The most recent HAP contract between IHCDA and Senate Manor (the "Renewal Contract") was executed in November 2005.  AR 339-54.  The Renewal Contract states, in part:

> During the term of the Renewal Contract, [IHCDA] will make housing assistance payments to the owner in accordance with the provisions of the Renewal Contract.  Such payments shall only be made for contract units occupied by eligible families ("families") leasing decent, safe and sanitary units from the owner in accordance with HUD regulations and other requirements.

AR 342.  Furthermore, the Renewal Contract states:  "The owner warrants that the rental units to be leased by the owner under [it] are in decent, safe and sanitary condition, as defined by HUD, and shall be maintained in such condition during the term of the Renewal Contract."  AR 344.  The Renewal Contract makes clear that it "shall be construed and administered in accordance with all statutory requirements, and with all HUD regulations and other requirements . . . ."  AR 345.

Because the Renewal Contract incorporates by reference the requirements of the original HAP between HUD and the original property owner, the following may occur in the event that Senate Manor defaults on the Renewal Contract:

> (b)    Rights of PHA and HUD if Owner Defaults under Contract.
>
> (1)    Events of Default.
>
> A default by the Owner under this Contract shall result if:
>
> (i)    The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by the [Contract Administrator ("CA")] in connection with any annual or other inspection; or

6

    (ii)    The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; . . .

* * *

(2)    CA Determination of Default.

Upon a determination by the CA that a default has occurred, the CA shall notify the Owner and the lender, with a copy to HUD where the CA is a PHA, of

    (i)    The nature of the default;

    (ii)    The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner and/or the lender to cure the default), and

    (iii)    The time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken.

If the Owner and/or lender fail to respond or take action to the satisfaction of the CA (and HUD where the CA is a PHA), the CA shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this Contract with HUD approval, in whole or in part, or to take other corrective actions to achieve compliance in its discretion, or as directed by HUD (where the CA is a PHA).

(3)    <u>Corrective Actions</u>.
Pursuant to paragraph (b)(2) of this section the CA, in its discretion or as directed by HUD (where the CA is a PHA), may take the following corrective actions either directly or in conjunction with or acting through a PHA:

* * *

    (iv)    Reduce or suspend housing assistance payments.

* * *

(4)    <u>HUD Rights</u>.

(For Private-Owner/PHA projects where the PHA is the lender.)

7

(i)     Notwithstanding any other provision of this Contract, in the event HUD determines that the Owner is in default of its obligations under the Contract, HUD shall have the right, after notice to the Owner, the trustee, if any, and the PHA giving them a reasonable opportunity to take corrective action, to proceed in accordance with paragraph (b)(3).

(ii)    In the event HUD takes any action under this section, the Owner and the PHA hereby expressly agree to recognize the rights of HUD to the same extent as if the action were taken by the PHA.  HUD shall not have the right to terminate the Contract except by proceeding in accordance with paragraphs (b)(1), (2), and (3) of this section and with the ACC.

AR 393-95 (Section 8 Housing Assistance Payments Program, Part II of the Housing Assistance Payments Contract, Section 8 Project No. IN36-E000-019, § 2.21(b)).

In a memorandum dated October 8, 2004, regarding responsibilities for CAs and/or performance based contract administrators ("PBCAs"), Beverly J. Miller, Director, Office of Multifamily Asset Management at HUD ("Miller"), stated:

[I]n those cases where the ACC gives the CA or PBCA exclusive authority to issue a Notice of HAP Default, the DEC will prepare a Notice of HAP Default and forward it to the CA/PBCS for a signature, copying the [Contract Administrator Oversight Monitor ("CAOM")], or Project Manager if CA, with the transmittal letter and the notice.

* * *

. . . Upon re-inspection, if the property inspection report reveals non-compliance with HUD's physical condition standards, the DEC will forward recommendations to Multifamily Hubs and Program Center Directors which may include a recommendation that the PBCA/CA suspend, abate or terminate the subsidy as allowed under the contract.

AR 665-66.

On October 16, 2006, HUD performed an annual REAC inspection at Senate Manor.  AR 8.  This was the first REAC inspection under Senate Manor's new ownership

because the property received a REAC score of 89c at a January 2004 REAC inspection of the property, under the previous owners.  AR 30.  Properties that score greater than 80 are designated as "Standard 2 Performing," which require physical inspection only once every two years.  24 C.F.R. § 200.857(b)(2)(ii).

The result of the October 2006 REAC inspection was a score of 38c* out of a possible 100 points.  AR 8.  The score reflected a deduction of 48.1 common area points; and 9.7 "H&S" points, which included various potentially life-threatening exigent/fire safety and smoke detector deficiencies, such as exposed electrical wires due to missing or broken cover plates, breakers, or fuses, and missing or inoperable smoke detectors.  *Id. See also* AR 10-13, 19.  The REAC score sheet projected that life-threatening deficiencies were present in 15 of the 77 units at Senate Manor.  AR 8.  The REAC inspection also disclosed other non-life-threatening deficiencies including:  broken or damages door locks and improperly sealed windows, missing or broken hand rails, missing or damaged lavatory sinks or other appliances, mold and mildew damage, holes, broken or leaking pipes or plumbing, damaged lighting, missing or expired fire extinguishers, and insect infestation. AR 10-14.

By letter dated October 17, 2006, HUD notified Senate Manor of the results of the REAC inspection and enclosed the REAC Inspection Summary Report.  AR 6-19.  The letter stated, in pertinent part:

> If the inspector noted any exigent health and safety (EH&S) deficiencies at the time of the inspection, you or your representative received a report listing those deficiencies.  You are required to correct all EH&S deficiencies at your property, not only those deficiencies noted by the inspector.  You must repair or mitigate all EH&S items immediately, and you must file a written report with the local field office using your letterhead, certifying to the repairs or mitigation of the EH&S items within three business days of the date of the

inspection.  The attached certification language <u>must</u> be included in your statement of completion. . . .

Because your property received a score of less than 60, the inspection has been referred to the Departmental Enforcement Center [(the "DEC")] for enforcement action.  HUD may suspend the administrative procedure described in 24 CFR 200 Subpart P when HUD determines it is necessary to protect HUD's financial interests and to protect the residents as provided by 24 CFR 200.857(i)(4).  Properties scoring below 60 have physical deficiencies that do not meet the contractual obligations to HUD.  Residents of such properties are not receiving the quality of housing to which they are entitled.  Accordingly, HUD is making a determination that it may proceed to enforcement action as authorized by existing statutes, regulations, contracts or other documents.

You will be contacted by the Enforcement Center to set up a meeting or discussion on the compliance needs of your property.  However, you should not delay the commencement of repairs to your property.  You should complete a survey of the physical needs of your entire property.  While the REAC inspection may provide baseline information, be advised that all property repair needs must be corrected.  This survey should be provided to the [DEC] upon your prompt completion.

If you fail to correct the physical deficiencies, fail to correct the EH&S violations, or, fail to provide HUD with the required certification within the required timeframes, or falsely certify to repairs made, these noncompliance issues may adversely affect your eligibility for participation in HUD programs. . . .

AR 6-7.  On October 18, 2006, HUD received Senate Manor's certification that the EH&S deficiencies had been mitigated.  AR 19.

On December 11, 2006, Senate Manor was referred to the DEC.  AR 40.  On February 6, 2007, the DEC sent its Final Team Report ("FTR") to IHCDA's Mark Young ("Young").  AR 22-37.  The FTR notes that the DEC team had contacted Young on January 29, 2007, who reported that IHCDA was "in agreement with the issuance of the HAP Default."  AR 29.  The DEC's FTR Action Plan indicated that the DEC would issue a notice of default by February 28, 2007, and that it would request a REAC re-inspection by April

10

28, 2007.  AR 36.  The Action Plan also noted that [i]f the REAC's follow-up inspection finds that the Owner has successfully cured the events of physical violation of the Regulatory Agreement and HAP Contract, as applicable, in accord with the Protocol, the DEC will close the referral and return the project to Housing for normal servicing." *Id.* "If[, however,] the REAC's follow-up inspection finds that the Owner has not successfully cured the events of physical violations of the Regulatory Agreement and HAP Contract, as applicable, the DEC will provide Housing with a proposed enforcement plan and/or other appropriate recommendations, if any, in accord with the Protocol." *Id.*

On February 9, 2007, a DEC Manager met with a Senate Manor owner, Garth McClain ("McClain"), over the telephone.  AR 40.  The DEC Manager noted:  "Owner meeting/call w/Garth McClain.  Advised of forthcoming notice, 60-day cure period, and survey/cert requirement.  Told him REAC would reinspect after cure period.  Said his mgmt [sic] company would get right on it." *Id.*

By certified letter dated February 12, 2007, the DEC and IHCDA issued to Senate Manor a Notice of Default of the Housing Assistance Payments (HAP) Contract ("Default Notice").  AR 20-21.  The Default Notice stated, in pertinent part:

> . . . Pursuant to Paragraph 2.5 of the HAP Contract, the Owner has agreed to maintain the Project in [a] decent, safe and sanitary condition. This standard is set forth in HUD regulation 24 C.F.R. § 5.703.
>
> On October 16, 2006, the [REAC] inspected the Project and the Project received a score of 38c*. This inspection report identified serious physical deficiencies that demonstrate that the Owner is in default of the HAP Contract. Some of the deficiencies cited in the REAC inspection report include:  damaged doors and door hardware; leaking pipes; inoperable auxiliary lights; insect infestation; damaged interior and exterior walls; and damaged windows.

Accordingly, the Owner shall take the following corrective action within 60 days of the date of this Notice:

> (1) Conduct a survey identifying the physical deficiencies at the Project;
>
> (2) Correct the physical deficiencies at the Project, including but not limited to, those deficiencies identified in the REAC inspection; and
>
> (3) Execute and provide the enclosed certification along with your survey . . . .

The Owner shall also provide a copy of these materials to the local HUD Project Manager for this Project, Dawn E. Dupree, as well as to [IHCDA].

HUD will re-inspect the Project to confirm that the Owner is in compliance with the HAP Contract.

If the Owner fails to take the necessary corrective action, then HUD and/or [IHCDA], as appropriate, may seek any and all available remedies, including, without limitation, the abatement, suspension, or termination of the HAP Contract and/or Civil Money Penalty actions for each failure to timely act as required by this Notice; including delivery of the survey and certification required by this Notice.

AR 20-21.  Young signed the Default Notice on behalf of IHCDA; DEC Chicago Satellite Office Director, James L. Pollock ("Pollock") signed the Default Notice on behalf of the DEC.  AR 21.

On or about February 14, 2007, the DEC requested a re-inspection of the Senate Manor property from REAC.  AR 458.

By letter dated April 10, 2007, Senate Manor notified the DEC and IHCDA that it had complied with the corrective action requested in the Default Notice.  AR 43-50.  However, the certification that accompanied the letter noted that replacement windows had been ordered, "but not received or installed."  AR 44, 46-49.

REAC did not perform a re-inspection at Senate Manor until October 23, 2007.[2]  AR 67.  At that time, the project received a score of 19c*, which included a deduction of 55.4 common area points and 35.9 H&S points.  *Id.*  The H&S deductions included life-threatening and exigent H&S deficiencies in common areas and living units, including:  exposed wiring, blocked or unusable emergency or fire exits, missing or inoperable smoke detectors, and missing or broken electrical outlet covers.  AR 69-75.  Numerous other deficiencies were noted including:  broken or missing hand railing in stairwells, inoperable or unlockable windows, roach infestation, water stains, damage, mold and mildew, tripping hazards, sharp edges, peeling paint, damaged locks, and cracks, gaps, holes and spalling in the exterior walls and foundation in both buildings.  *Id.*  The October 2007 REAC report projected life-threatening deficiencies in 54 out of the 77 units in the project, and projected non-life-threatening deficiencies in 73 out of the 77 units in the project.  AR 67.

By letter dated October 26, 2007, HUD notified Senate Manor of the results of the REAC inspection.  AR 65-66.  The letter notes that "the most recent physical inspection [was] performed after [Senate Manor's] opportunity to correct physical deficiencies previously noted at [the] property."  AR 65.  The October 26, 2007, letter also stated, in pertinent part:

> The enclosed report discloses that you continue to be in violation of your contractual, regulatory and statutory obligations.  Based on the results of this most recent inspection, the local Hub/Program Center will develop a compliance or enforcement strategy for the project.

_____

[2]Although there is no explanation in the record for why a re-inspection of Senate Manor did not occur until October 2007, an email string dated in August 2007 that is in the record suggests that there were quite a few properties that needed re-inspection. AR 456-57.  Senate Manor is on the list of such properties provided in the email string. AR 457.

You will be contacted by [its] local Hub/Program Center to advise your of their decision relative to the disposition of [the] property.  However, you should not delay in making repairs to your property so that present tenants are afforded decent, safe and sanitary housing. . . .  Under HUD's Previous Participation  Review  and  Clearance  Procedure,  non-compliance  may constitute  a  standard  for  disapproval  pursuant  to  24  CFR  Section 200.230(c)(3).  . . .

*Id.*

By letter dated October 25, 2007, Senate Manor notified IHCDA's contractor, Indiana Quadel, that it had mitigated the "Exigent and Fire Safety Hazards [("EH&Ses")] that were found during a recent REAC inspection formed on October 23, 2007.  AR 59. The letter indicated that the EH&Ses related to eleven defective windows could not be corrected as of the date of the letter because Senate Manor's contractor needed to order parts and "parts for these windows are limited."  AR 60.  The issue with the windows was cited as H&S deficiencies on the October 23, 2007, REAC report because the windows would not stay open.  AR 69-74.

On October 29, 2007, HUD received notice from Indiana Quadel that Senate Manor had failed to mitigate the window deficiencies.  AR 467-68.  By letter dated October 29, 2007, Indiana Quadel acknowledged receipt of Senate Manor's October 25, 2007, letter and advised Senate Manor that when it completed work on the windows, it need to send in a completed HUD certification form.  AR 81.

On November 2, 2007, HUD referred Senate Manor to the DEC because of the 19c* REAC score.  AR 40.  On November 20, 2007, HUD placed a flag on Senate Manor in its computer system "to ensure that HUD staffs nationwide [were] aware of the potential risks of dealing with the participants."  AR 83-84; 3.  On November 21, 2007, HUD Field Office

14

personnel visited Senate Manor "to see why the REAC [s]core was so low at 19c*."  AR 40.

After the visit, HUD Project Manager, Dawn E. Dupree ("Dupree") noted the following:

> Advised on-site staff to have the owner contact the HUD Office and let us know if he plans to appeal the score on or before 11-30-07.  The HUD Office will determine whether or not to abate their Section 8 after all documentation is gathered.  We took pictures while we were at the property today for our documentation.

*Id.  See also* AR 489-517 (photographs taken).

On November 28, 2007, Pollock, DEC Manager, noted that HUD's Indianapolis Office of Multifamily Housing ("OMFH") had requested to withdraw the referral of Senate Manor to the DEC because it "ha[d] a plan in place to resolve."  AR 40.  *See also* AR 730-31.  Pollock declared that the "plan" referred to in this entry was "OMFH's tentative plan for Compliance/Disposition/Enforcement of Senate Manor, also referred to as a CDE plan." AR 731.

By letter dated December 5, 2007, Senate Manor appealed the October 2007 REAC score by requesting a "Database Adjustment," AR 86-90, apparently pursuant to 24 C.F.R. § 200.857(h).  Senate Manor challenged 43.7 deduction points, including: including 9.1 points for cracks/gaps in the foundation of Building 1; 11.7 points for exposed wiring in the basement meter area of Building 1, 11.7 points for exposed wiring and an unsecured meter box in the Southeast corner of the basement area of Building 1; 4.9 points for cracks/gaps in the foundation of Building 2; and 6.3 points for exposed wires/open panels in the basement meter area of Building 2.  AR 86-87.  Senate Manor stated that "all of the aforementioned items [were] preexisting conditions that were not flagged on the last six (6) REAC inspections and thus, were not anticipated to be potential deficiencies."  AR 87.

On January 14, 2008, HUD's Office of Public and Indian Housing Real Estate Assessment Center (the "PIH-REAC") issued a decision letter with respect to Senate Manor's request for a database adjustment.  AR 91-93.  Based on Senate Manor's submission, the PIH-REAC re-scored the physical inspection and awarded Senate Manor an additional 6.3 points for the exposed wires/open panels in the basement area of Building 2 because the meter box was removed in 1990.  AR 93.  That brought the REAC score for the October 2007 re-inspection up to 26c*.  AR 91.

By letter dated January 14, 2008, the REAC re-issued a notice to Senate Manor of its failing REAC re-inspection score.  AR 94-112.  The January 14, 2008, letter reiterated that Senate Manor continued to be in violation of its contractual, regulatory and statutory obligations and informed Senate Manor that "the local Hub/Program Center [would] develop a compliance or enforcement strategy for the project."  AR 94.

By letter dated January 23, 2008, IHCDA's contractor, Indiana Quadel, informed Senate Manor of the results of a Management, Occupancy and Fair Housing Review ("MOFHR") performed at Senate Manor on November 1, 2007.  AR 113-24.  IHCDA reported to Senate Manor that the property received a below average rating. AR 113.  The MOFHR report letter stated, in part:

> . . . Our findings indicate some suggested procedural changes and/or compliance related violations, which are documented in this package.
>
> The corrective actions for the findings listed on the Management Review Report, detailed in page two and the attachment to management review, must be submitted to our office.  Please provide documentation of any and all materials required to bring these finding into compliance with the HUD regulations referenced in this package.
>
> This report could affect your previous participation clearance, along with that of your management company.  If the rating is not appealed within 30 days

16

or is appealed and sustained, a copy of the management review will be provided to the local HUD office and will be considered by HUD during any future 2530 clearance processing.  Previous participation clearance can be denied unless acceptable progress is made in resolving serious violations; i.e., generally those findings for which the phrase "Required Corrective Action" is used.

* * *

Whether or not you appeal the rating, we must still have your written response to the exceptions noted in the report within 30 days of the letter. Corrective actions taken on findings from file reviews may be documented on owner's letterhead but must be submitted to our office by the dates indicated in this package.

AR 113.

On January 25, 2008, HUD's Chicago, Multifamily Hub Director, Edward J. Hinsberger ("Hinsberger"), sent a CDE plan to HUD headquarters that recommended moving forward to abate the Section 8 at Senate Manor.  AR 40.

By letter dated February 27, 2008, Hinsberger sent a tenant relocation assistance request for the residents of Senate Manor to Beverly Miller ("Miller"), Director, Office of Asset Management, along with the CDE plan for the property.  AR 125-27.  In the letter, Hinsberger states:

The Section 8 project based [HAP] contract for the subject property is being abated because the owner failed to maintain the property in compliance with the physical condition requirements noted in the HAP contract and HUD regulations.  Specific information is contained in our [CDE] plan which accompanies this memorandum.

Pursuant to instructions found in Deputy Assistant Secretary, Charles H. Williams' memorandum dated May 31, 2006[,] entitled, "Fiscal year 2006 Property Disposition Program", [sic] and in NOTICE PIH 2001-41 (HA), I am requesting your approval to provide relocation assistance to all eligible residents impacted by the Section 8 [HAP] contract abatement.

AR 125.

The enclosed CDE plan noted the history of the REAC scores at Senate Manor and the failure of the facility management to mitigate the EH&S problem with windows that would not remain open.  AR 127.  In addition, the CDE stated that

> The Director, Supervisor and PM visited the property to determine what recommendation to pursue.  Upon visiting the property, it was determined that replacement of Management would not accomplish a higher REAC score in and of itself.  Very large sums of money are needed to bring the property to a passing score in REAC.

> The Director's recommendations [sic] is to send an abatement letter be sent [sic] from this office to abate the Section 8.

*Id.*

In approximately mid-March 2008, Miller responded to Hinsberger and authorized him to conduct a relocation at Senate Manor.  AR 174.

By letter dated April 2, 2008, Indiana Quadel informed Senate Manor that because Senate Manor had not rectified all of the deficiencies noted in the November 1, 2007, Management and Occupancy Review, a flag had been placed in HUD's file for the property that "may affect future participation in [IHCDA] programs unless the deficiencies related to the flag are satisfactorily resolved."  AR 175.

On or about April 4, 2008, Hinsberger requested vouchers for the residents of Senate Manor pursuant to his decision to abate the HAP contract because of the owner's failure to maintain the property.  AR 177.

On April 7, 2008, Senate Manor complied with IHCDA's October 29, 2007, directive that it certify mitigation of EH&S deficiencies.  AR 112.

On April 10, 2008, Young, of IHCDA, notified HUD that neither IHCDA nor Indiana Quadel wished to perform relocation efforts for the Senate Manor property.  AR 453.

18

Hinsberger, and the Indianapolis HUD field office followed up with relocation efforts.  AR

179, 207.

By certified letter dated April 22, 2008, Hinsberger notified Senate Manor of HUD's

decision to suspend and abate all Section 8 payments pursuant to the HAP "Contract, Part

1, Section 1.(c) and 24 CFR 886.123(d)," effective June 1, 2008.  AR 233.  The April 22,

2008, letter summarized HUD's findings as follows:

> By its Notice dated February 12, 2007, the Secretary of [HUD]
> declared that Senate Manor Properties, LLC ask/a Senate Manor
> Apartments (Project) was in default of its HAP Contract for failure to maintain
> the Project in a decent, safe, and sanitary condition.
>
> The Owner did not satisfactorily address the Project's unacceptable
> physical conditions as required by HUD's Notice of Default of the [HAP]
> Contract dated February 12, 2007.  A subsequent REAC inspection was
> performed on October 23, 2007, and out of 100 possible points, the Project
> scored 19c.  That inspection confirmed that the Project remained in
> unsatisfactory physical condition.  Further, the Owner has not provided HUD
> with any other acceptable intended action to cure the HAP Contract default.
> Therefore, the Owner has failed to keep and maintain the Project in a
> decent, safe, and sanitary condition as required by the Owner's HAP
> Contract and 24 CFR 886.123.

*Id.*  The letter also notified Senate Manor of HUD's intent to provide Section 8 vouchers to

eligible residents and to provide relocation assistance to eligible families.  *Id.*  HUD copied

Indiana Quadel, IHCDA's contractor, on the letter.  AR 235.

The Court takes judicial notice that 24 C.F.R. § 886.123(d) states:

> (d) Units not Decent, Safe, and Sanitary.  If HUD notifies the Owner that he
> has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition
> and the Owner fails to take corrective action within the time prescribed in the
> notice, HUD may exercise any of its rights or remedies under the Contract,
> including abatement of housing assistance payments, even if the Family
> continues to occupy the unit.

The term "Contract" in 24 C.F.R. § 886.123(d) is defined as "[a] written Contract between the Owner of an Eligible Project and HUD for providing Housing Assistance Payments to the Owner on behalf of Eligible Families pursuant to this part."  24 C.F.R. § 886.102.

On April 24, 2008, HUD Field Office personnel conducted a site visit of the Senate Manor property "in preparation of the Section 8 [a]batement process."  AR 39.  The HUD report stated:

> During the inspection, we noted chipping & peeling paint throughout the exterior of both buildings.  The wood siding was coming loose.  There was also rust and deteriorated steps and railings.  There was also exposed wiring on the exterior.  These citations were some of the problems we observed during the exterior inspection.  Per our conversation with the tenant in Building 213, there is roach infestation in the apartments, roof/ceiling leaks, and the majority of tenants complained about these inadequate living conditions.

*Id.*  Apparently, the HUD Field Office personnel took photographs during this visit.  AR 38-39; 518-73.

On May 8, 2008, a HUD Field Officer conducted an inspection of the exterior physical condition of the Senate Manor property and recorded the observations in a report.  AR 237-39.  The Field Officer noted numerous structural an other serious defects and deficiencies and estimated that repair would cost hundreds of thousands of dollars.  *Id.*

On May 12, 2008, Hinsberger and several HUD Field Officer personnel met with Senate Manor's owners.  AR 38-39.  During the meeting, Senate Manor's owners offered to provide a "third party" REAC inspection and proposed action plan to HUD so that the facility could maintain its Section 8 status.  *Id.*; AR 240.  HUD agreed to review Senate Manor's third-party inspection report and proposed plan.  However, Hinsberger told the owners that HUD had not changed its mind to abate the Section 8.  AR 39, AR 240.

Moreover, Hinsberger told the owners that a third-party inspection and action plan "may not alter [HUD's] decision to abate the Section 8 for Senate Manor."  AR 39, AR 240.

On or about May 19, 2008, Senate Manor sent its Action Plan to HUD's Field Office, which included a REAC inspection report issued to Senate Manor by REACSolutions, a consulting firm.  AR 241-68.  Senate Manor's Action Plan included using additional escrow funds of $8,000.00 per month and a $25,000.00 line of credit to pay for necessary improvements to the exterior and wiring issues.  AR 241-43.  However, not all of the work could be completed immediately.  AR 242-43.  In addition, Senate Manor intended to use REACSolutions' consulting services and a law firm to help it through the process.  AR 243.

A REACSolutions representative inspected Senate Manor on May 9, 2008.  AR 246. The inspector used "the most rigid interpretation of the UPCS protocol" because the inspector considered it his "job . . . to present not only clearly existing deficiencies, but to warn ownership/management of potential 'gray area' defects which may or may not be cited in the next inspection."  *Id.*  The inspector noted that

> [t]he most noticeable category of damage to the walls of the two buildings is the condition of **Missing Pieces/Holes/Spalling**. . . .  This condition is both difficult and expensive to remediate.
>
> The threshold for this deficiency in the UPCS protocol is very low, with the condition being recorded for spalling which affects areas as small as 8.5 by 11 inches.  It would appear to be nearly impossible to completely eliminate the occurrence of this deficiency, due to the age of the buildings and the low threshold for this deficiency.

AR 247 (emphasis in original).  In addition, the inspector noted that

> [t]he combined Building Systems of the two buildings accounts for about 20% of the overall score.  This 20% should be considered a critical "building block" in establishing a passing score on any subsequent inspection.  The property suffered scoring losses of 20 and 14 points on the prior inspections.

21

Had Systems scored 100%, the respective scores of the two prior inspections would have been 58 and 40 rather than 38 and 26.

Systems issues identified on both inspections were relatively simple and inexpensive issues to eliminate compared to issues on the Exterior and Common Areas. . . .

Despite effective repairs to all these issues since the last REAC inspection, my inspection revealed a few debatable and easily addressable instances of similar problems.  These are very old buildings, and even the modernized and plumbing components have been in place a long time.

AR 249.  Moreover, the inspector noted that

[o]ne of the most significant unit deficiencies cited in the most recent inspection, and [in] terms of point value lost, and the fact that it is considered an exigent or life-threatening condition, was **Emergency/Fire Exits, Blocked/Unusable**.  This deficiency was cited when the secondary means of egress from any living area is obstructed due to an inoperable window, furniture blocking the window, air conditioner, or other situation that could impede emergency egress.

AR 251 (emphasis in original).  However, the inspector continued:

Many of the units were cited for blocked egress due to the fact that window balances were inoperable and windows did not stay up when opened.  The legitimacy of this judgment call on the part of the inspector is certainly questionable.  It does not prevent egress, though it may momentarily slow egress.  Most anyone who can open a window, would be capable of holding the window up with one [h]and as they crawled out.

*Id.*

The third-party inspector also noted that other common non-life-threatening health and safety issue to look out for were mold and mildew, sharp edge hazards, infestation by rodents, and infestation by insects.  *Id.*  He suggested treating mold and mildew aggressively, increasing the frequency of housekeeping inspections, and adopting a zero-tolerance attitude toward infestations.  *Id.*

22

By letter dated June 2, 2008, HUD responded to Senate Manor's Action Plan and third-party inspection report.  AR 240.  HUD stated:

> After deliberation of the Owner's plan and review of the sources and uses, the Department determined that the plan does not adequately address all of the needs of the property nor does it demonstrate that all repairs can be completed prior to when the next REAC Inspection would most likely occur, which should be in September, 2008.  Consequently, our decision [to abate Section 8 payments] remains unchanged.

*Id.*

On June 10, 2008, Hinsberger extended Section 8 subsidies for Senate Manor to ensure that the owners would have funds to pay the electric bills for the month of June to operate the air conditioning.  AR 439.

Apparently at the urging of Senate Manor's owners, AR 720, on June 11, 2008, HUD Field Office personnel had a conference call with Chief of Staff for Congressman Andre′ Carson, Ellen Quigley ("Quigley"), regarding the abatement of Section 8 payments for Senate Manor.  AR 38.  HUD Field Officer personnel explained to Quigley the reasons for HUD's decision to abate, and the relocation and voucher process.  *Id.*

Even though it had received notice of the instant lawsuit, on June 18, 2008, HUD indicated its intent to proceed with relocation activities.  *Id.*

### III.  DISCUSSION

Senate Manor argues that HUD violated the APA when it terminated Section 8 payments for two reasons:  1) HUD had no legal authority to abate the payments under the HAP contract or any other statutory grant of authority; and 2) HUD's decision was arbitrary and capricious because HUD denied Senate Manor a meaningful opportunity to correct the

deficiencies cited in the October 2006 REAC inspection report and because HUD failed to follow the steps required under its own regulations to abate the Section 8. HUD denies that its decision or its decision-making process violated the APA in any way.

The Court concludes that, although HUD may have bypassed IHCDA's involvement in the last step of the process to abate Section 8 payments to Senate Manor, under the contractual, statutory and regulatory guidelines, HUD had the authority to direct IHCDA to make the abatement under the circumstances presented by the facts of this case. The procedural mistake, or technical misstep, in this case is not one that necessitates a remand because HUD's underlying decision-making process was not arbitrary and capricious.

The original HAP contract between HUD and the prior owners of Senate Manor, which was incorporated by reference into the Renewal Contract, specifically allows for HUD to direct termination of the HAP contract where the CA is a PHA, as IHCDA is in this case. AR 393-95. Moreover, it is clear that one of the corrective actions contemplated by the original HAP is the suspension of housing assistance payments. *Id.* HUD had obtained agreement from IHCDA that a notice of default should issue; moreover, IHCDA co-signed the notice of default. AR 29, 21. Therefore, contrary to Senate Manor's assertion that IHCDA might have made a different decision regarding whether to abate Section 8 payments, the contractual obligations of IHCDA are clear: HUD may direct termination of the HAP contract where the CA is a PHA, at which time the ACC would require IHCDA to take the action demanded by HUD. AR 393-95, 582. Further, there is no dispute that HUD had directed its field offices to take decisive action when a property fails to receive REAC inspection scores of 60 or above after two inspections, with an opportunity to cure in between. AR 1.

Senate Manor makes much of the fact that HUD did not perform a re-inspection of the property immediately after the sixty-day cure period. Senate Manor argues that through HUD's delay, Senate Manor was denied a meaningful opportunity to correct the issues raised by the October 2006 REAC inspection. This argument is unavailing. Although earlier-written policy memorandum on the subject suggest that re-inspections would occur immediately following the sixty-day grace period, later-written policy memorandum imply that re-inspections must take place after sixty days, but no longer include the "immediate" language of the earlier policies. *Compare* AR 677 (stating in a January 2003 protocol that "[a] new inspection will be performed immediately following the 60-day period") *with* AR 666, 670 (stating that re-inspection would occur after the 60-day cure period or after owner certification, whichever comes first). Therefore, it seems that so long as the owner has a minimum of sixty days to cure the deficiencies noted in a REAC inspection, it comports with HUD policy; a re-inspection may take place any time after the sixty-day cure period. In this case, the next inspection at Senate Manor occurred in October 2007, at which time the owner had still not completed work on windows that the owner had indicated it was working to complete in April 2007. *Compare* AR 44, 46-49 *with* AR 60, 79-75.

Senate Manor seems to suggest that because the October 2007 REAC inspection identified some different types of violations that it not really a re-inspection. But, according to HUD policy, the name of the next REAC inspection is not what controls. Rather, what controls is whether the facility receives two consecutive REAC inspections scores below sixty. AR 1. Such an occurrence under the policy requires immediate action by HUD,

which could include exactly the action HUD took in this case:  to abate Section 8 payments for the property.  AR at 1-2.

Senate Manor also argues that it never had the opportunity to respond to the October 2007 REAC before HUD acted to abate Section 8 payments.  However, Senate Manor was given another sixty-day period to cure the defects cited in the October 2007 REAC inspection report.  AR 59-60, 81, 467-78.  Moreover, Senate Manor availed itself of the opportunity to challenge the October 2007 score, and was successful in improving that score from 19c* to 26c* on appeal.  AR 86-90, 91-93.  Therefore, it is difficult to give weight to Senate Manor's argument that it did not have an opportunity to challenge or otherwise address the October 2007 REAC score.

Senate Manor also argues that HUD's decision-making process was flawed because HInsberger never ensured that conditions existing at the property were "significant" or determined that the housing market in Indianapolis could accommodate voucher holders who would be displaced if HUD abated the Section 8 payments to Senate Manor.  Both of these elements are required under HUD policy before a Hub makes a recommendation to abate.  AR 1-2.  With respect to the "significant" requirement, there is no dispute that the two REAC inspection reports were in the record.  AR 8-19, 67-75.  Both REAC reports indicated numerous health and safety issues that could effect the safety of residents, which is one of the standards under which "significant" conditions is measured.  AR 1.  In addition, the record indicates that HUD personnel visited Senate Manor after the October 2007 REAC inspection to see why its REAC inspection score was so low.  AR 40.  Pictures were taken of the facility at that time and were included in the record.  AR 489-517.  Furthermore, the results of IHCDA's contractor's, Indiana Quadel, MOFHR, performed on

26

November 1, 2007, documented additional deficiencies in Senate Manor's management practices.  AR 113-24.  Coupled with the two REAC reports, Indiana Quadel's MOFHR could lead a reasonable person to conclude that the second type of "significant" condition also existed at Senate Manor, which is a pattern of non-compliance or mismanagement.  AR 1.  In other words, HUD "could have reasonably believed that in this case there [were] no feasible alternatives or that alternatives [] involve[d] unique problems."  *Overton Park*, 401 U.S. at 416.

Hinsberger's comments about the CDE plan he submitted on January 25, 2008, reflects that he had concluded from the record that "the owner failed to maintain the property in compliance with the physical condition requirement noted in the HAP contract and HUD regulations."  AR 125-27.  In addition, the CDE itself noted that the owner failed to mitigate the cited deficiencies regarding windows even as late as January 2, 2008.  AR 127.  The CDE also remarked:

> The Director, Supervisor and PM visited the property to determine what recommendation to pursue.  Upon visiting the property, it was determined that replacement of Management would not accomplish a higher REAC score in and of itself.  Very large sums of money are needed to bring this property to a passing score in REAC.

*Id.*  This notation evidences HInsberger's findings that significant conditions existed at Senate Manor that warranted abatement.  The Court concludes that HUD's decision complied with its policy regarding taking decisive action when a property fails to meet the requirement to maintain a physical inspection score above 60.  AR 1.  Moreover, the Court concludes that HInsberger's analysis considered all of the relevant factors as required by the APA.

27

Once Hinsberger made the decision to abate Section 8 payments to Senate Manor, he took steps to obtain approval to relocate the residents of Senate Manor, which included obtaining authorization from Miller, obtaining vouchers, and confirming with the Indianapolis field office that the Indianapolis housing market could accommodate the residents who would be displaced by an abatement.  AR 174, 177, 722-23 (Hinsberger Aff. ¶ 5).  Senate Manor suggests that Hinsberger's verbal inquiry with the field office does not comply with HUD's policy.  Specifically, the policy states:

> Abatement/termination – Depending upon the circumstances, the Hub director may abate with the intent to terminate Section 8 contracts. To abate and terminate the Section 8 contract(s), the Hub director must make a determination that the market can accommodate voucher holders, and order and issue them for the affected tenants.

AR 2.  The Court disagrees with Senate Manor's view of the policy.  There is no specific step in this policy that a Hub director must take to determine if the market would accommodate voucher holders.  Rather, the policy leaves it to the discretion of the Hub director.  Furthermore, Senate Manor has failed to point to any specific regulation that required Hinsberger to do more than he did in this instance.  The Court will not impose additional requirements upon HUD when the regulation and policies call for agency discretion.  *Accord Overton Park*, 401 U.S. at 416 (stating that a court's inquiry into the facts must be "searching and careful," but that a "court is not empowered to substitute its own judgment for that of the agency").

The Court has concluded that Hinsberger's decision to abate Section 8 payments was not arbitrary, capricious or otherwise not in accordance with the law.  His only misstep was not following the letter of the Renewal Contract and insisting that IHCDA effectuate the abatement.  As the Court discussed earlier, however, the contractual obligation of

IHCDA in these instances is clear:  if HUD has determined that abatement of Section 8 payments are proper under the terms of the HAP contract, IHCDA must enforce HUD's decision under both the HAP contract and the ACC.  AR 393-94 (describing that HUD may direct a CA that is a PHA to take action under the default provisions of the Renewal Contract, including corrective actions such as reducing or suspending Section 8 payments); AR 621-22 (describing a PHA's responsibility under the ACC to "take legal action as directed by HUD for enforcement of the HAP contract").  This is confirmed further in the regulations, which provide HUD with the authority to decide to abate Section 8 payments when an owner fails to maintain the property in a decent, safe, and sanitary condition, and pursuant to the relevant HAP contract.  24 C.F.R. § 886.323.

The Court notes that Senate Manor cannot argue that, under the relevant contracts and regulations, HUD exceeded its authority to ensure, through appropriate inspections, that Senate Manor met the living condition standards.  The ACC specifically provides that HUD will perform the relevant inspections and direct a PHA to take corrective action as necessary.  AR 621-22.  Moreover, HUD personnel were in contact with Senate Manor personnel and with IHCDA's representatives throughout the process.  Any error in not allowing IHCDA to provide notice to Senate Manor under the circumstances had no bearing on the ultimate outcome and caused no prejudice to Senate Manor.  Moreover, remand to HUD to correct its error and demand that IHCDA notify Senate Manor of a decision to abate Section 8 payments does not change the outcome and elevates form over substance.  *See Illinois v. I.C.C.*, 722 F.2d 1341, 1348 (7th Cir. 1983).

For these reasons, Senate Manor's Motion for Declaratory Judgment and Injunctive Relief on the merits is **DENIED**; HUD's Motion for Summary Judgment is **GRANTED**.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court **GRANTS** defendant's, United States Department of Housing and Urban Development, Motion for Summary Judgment, and **DENIES** plaintiff's, Senate Manor Properties, LLC, Motion for Preliminary Injunction and request in its Amended Complaint for Declaratory Judgment and Injunctive Relief under the Administrative Procedures Act.  Judgment shall enter accordingly.

IT IS SO ORDERED this 24th day of November, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distributed to:

Michael R. Limrick
BINGHAM MCHALE LLP
mlimrick@binghammchale.com

Wayne C Turner
BINGHAM MCHALE LLP
wturner@binghammchale.com

William Lance McCoskey
UNITED STATES ATTORNEY'S OFFICE
william.mccoskey@usdoj.gov

Debra G. Richards
UNITED STATES ATTORNEY'S OFFICE
debra.richards@usdoj.gov

Jill E. Zengler
UNITED STATES ATTORNEY'S OFFICE
jill.zengler@usdoj.gov